## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARCUS LOVE, | ) | |
| | ) | No. 12 CV 7141 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration,[1] | ) | |
| | ) | May 16, 2014 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Marcus Love seeks Supplemental Security Income ("SSI") under Title XVI of
the Social Security Act, 42 U.S.C. § 1381, *et seq.*, based on his claim that he is
unable to work because of borderline intellectual functioning, a history of seizures,
polyuria, low blood pressure, and a hypothalamic mass.  After his application was
denied in a final decision by the Commissioner of the Social Security
Administration, Love filed this suit seeking judicial review.  *See* 42 U.S.C. § 405(g).
Before the court is Love's motion for summary judgment seeking reversal of the
Commissioner's decision and the Commissioner's cross-motion for summary
judgment seeking to affirm the Commissioner's decision.  For the following reasons,
Love's motion for summary judgment is denied and the Commissioner's cross-
motion is granted:

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who
became the Acting Commissioner of Social Security on February 14, 2013—is
automatically substituted as the named defendant.

## Procedural History

Love applied for SSI on October 14, 2009, alleging disability beginning on July 22, 1973. (Administrative Record ("A.R.") 107.) After his claims were denied initially and upon reconsideration, (id. at 50-55, 60-63), Love sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 73-74, 80-85). The ALJ held a hearing on February 15, 2011, at which Love and a vocational expert provided testimony. (Id. at 26-49.) On May 26, 2011, the ALJ issued a decision finding that Love is not disabled within the meaning of the Social Security Act and denying his SSI claim. (Id. at 11-21.) Love submitted additional evidence to the Appeals Council dating from April 2011 to October 2011. (Id. at 337-50.) When the Appeals Council denied Love's request for review in July 2012, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On September 6, 2012, Love filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Love suffers from numerous ailments including a remote history of seizure disorder, a hypothalamic mass, a long history of urinary urgency, and borderline intellectual functioning. (A.R. 13.) At the February 2011 hearing before the ALJ, Love presented both documentary and testimonial evidence in support of his claim.

## A.     Medical Evidence

At the request of the state disability agency, John Brauer, Psy.D., a clinical psychologist, performed a consultative evaluation of Love in December 2009.  (A.R. 204-07.)  Love related to Dr. Brauer that he took five years of special education courses in high school before graduating, that he worked as a dishwasher for approximately nine years, and that he spent ten years in jail.  (Id. at 205.)  Love also told Dr. Brauer that he had never been hospitalized or medicated for mental illness.  (Id.)

Dr. Brauer administered a mental status examination and the WAIS-4 intelligence test.  (Id. at 206-07.)  His impression was that Love exercised his best effort and that the scores appeared to be a valid representation of Love's capacities. (Id. at 206.)  Love's full scale I.Q. score was 70, with scores in the component areas ranging from 70 to 81.  (Id. at 207.)  Dr. Brauer explained that Love's scores placed him in the low average range of intellectual functioning in regard to perceptual reasoning and in the borderline range in all other areas.  (Id.)

Dr. Brauer's report informed the opinion of Jerrold Heinrich, Ph.D., a state agency consultant who reviewed Love's file and provided a mental functional capacity assessment.  (Id. at 216-233.)  He noted that Love had received benefits as of January 1, 1991, because of a diagnosis of mental retardation.  (Id. at 228.)  In a report dated December 16, 2009, Dr. Heinrich characterized Love's medically determinable impairment as borderline intellectual functioning.  (Id. at 217.)  He evaluated Love under Category 12.02, entitled "Organic Mental Disorders."  (Id. at

216.)  Regarding the 12.02(B) factors, Dr. Heinrich opined that Love exhibited mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had not presented evidence of any episodes of decompensation.  (Id. at 226.)  He further opined that the evidence did not establish the presence of the "C" criteria under category 12.02.  (Id. at 227.)  But Dr. Heinrich concluded that Love "retains the mental and behavioral capacity" to perform only simple tasks "within an organized setting," and to make adjustments to "routine changes in his environment as long as they are not too frequent."  (Id. at 232.)

The state disability agency also requested that Love submit to an internal medicine consultative examination.  (Id. at 208-211.)  On December 26, 2009, Dr. Stanley Simon reviewed Love's file and conducted a consultative examination. (Id.)  Dr. Simon noted Love's chief complaints of a learning disability, a seizure disorder, and birth defects.  (Id. at 208.)  Love told Dr. Simon that he has difficulties with reading and needs extra time to calculate change when shopping.  (Id.)  He also told Dr. Simon that he was diagnosed with seizures secondary to a birth defect, that he took medication for his seizures, that his last seizure episode occurred in 1980, and that he stopped taking his medication in 1995.  (Id.)  Dr. Simon noted normal range of motion in all of Love's major joints and in the cervical and lumbar spines.  (Id. at 210.)  After summarizing Love's recitation of his medical history and the results of the examination, Dr. Simon noted the following impressions: a

learning disability, a history of seizure disorder, and a history of birth defect. (Id. at 211.) There is no mention of Love's urinary urgency in the report.

Seven months after Love visited Dr. Simon and Dr. Brauer for their evaluations, Love sought care at a free clinic in July 2010. (Id. at 240.) A doctor at the clinic, Dr. Cerniak, ordered numerous tests and referred Love to a foot doctor and to a urologist. (Id.) Love complained to Dr. Jones, the urologist, of urinary frequency and incontinence. (Id. at 283.) Love said that he voids six or seven times during the night. (Id.) He also told Dr. Jones that he had suffered a seizure on July 9, 2010. (Id.) As a result of the seizure, Love underwent an electroencephalogram ("EEG") on July 21, 2010. (Id. at 268-69.) Dr. Peter Analytis reported that the EEG was normal and showed no evidence of seizure activity. (Id. at 268, 317.) Dr. Cerniak prescribed Dilantin following the EEG. (Id. at 245.) The record contains no other evidence of seizure activity.

In July 2010, an MRI of Love's lumbar spine showed mild degenerative changes in the lower lumbar spine and a mild diffuse disk bulge at L4-5 with minimal impression on the anterior thecal sac. (Id. at 266.) In August 2010, Love was given an order for a CT scan of his abdomen and pelvis because of diagnoses of anemia and hyperlipidemia. (Id. at 316.) The CT scan revealed an "[a]pparent incisional hernia . . . with no loops of bowel within it." (Id.) On September 14, 2010, an MRI of Love's brain showed a "lesion within the hypothalamus that appears to involve the pituitary stalk." (Id. at 264.) The MRI report states that "the lesion

surrounds portions of the third ventricle resulting in moderate to severe hydrocephalus." (Id.)

On September 22, 2010, Love visited Dr. Thomas Hurley for an evaluation of the abnormal MRI scan. (Id. at 262.) Dr. Hurley noted that Love had developed a seizure disorder as a child as a result of bacterial meningitis. (Id.) Dr. Hurley also noted Love's cognitive impairments and history of urinary urgency dating from childhood. (Id.) Dr. Hurley suspected that Love's lesion was a hypothalamic glioma. (Id. at 263.) He recommended a short interval study to confirm that the mass was not growing rapidly. (Id.) He also ordered blood work to assess the hypothalamic-pituitary axis. (Id.) A second MRI taken on October 15, 2010, showed a "persistent abnormality involving the hypothalamus and pituitary stalk that is grossly unchanged" with "[s]table appearing hydrocephalus." (Id. at 258.) Dr. Hurley reviewed the second MRI with Love on October 19, 2010. (Id. at 257.) He concluded that the MRI showed no change in the lesion "which suggests the likely diagnosis of a low grade glioma." (Id.) He commented that "[s]urgical resection is impossible and biopsy does have risk . . . recommendation is to observe and treat (radiation therapy) only if the tumor increases in size." (Id.) Dr. Hurley also reviewed Love's blood work and noted that the endocrine studies showed "some dysfunction of the hypothalamic-pituitary axis." (Id.)

Love was referred to a nephrologist for treatment of his polyuria. (Id. at 326.) At a visit on September 27, 2010, Love complained of waking 10 times a night because of polyuria. (Id. at 327.) Records from the following month show that Love

started desmopressin and that his polyuria was "resolved." (Id. at 326.) Records from November 2010 and January 2011 show that Love's urine output had decreased and that he was doing well. (Id. at 324-25.)

Another medical record from September 2010 includes Love's complaint of bone aches in his feet, legs, and back upon waking. (Id. at 278.) He said that he feels okay after he walks around. (Id.) He reiterated complaints regarding frequency of urination and incontinence. (Id.) On October 20, 2010, Love visited a podiatrist. (Id. at 274.) The podiatrist diagnosed him with plantar fasciitis, and encouraged him to stretch and to use arch supports. (Id. at 255, 274.)

At the close of the administrative hearing on February 15, 2011, the ALJ agreed to hold open the record for 30 days. (Id. at 48.) Sometime after the ALJ issued an unfavorable decision in May 2011, Love submitted an evaluation from Dr. Hurley dated April 21, 2011. (Id. at 338.) The Appeals Council noted the inclusion of this evaluation in its list of exhibits. (Id. at 5.) In that evaluation, Dr. Hurley opined that "as long as there is no change in the hypothalamic mass I believe it is best just to observe." (Id. at 338.) He gave Love a referral to see an endocrinologist. (Id.) He also offered the following opinion: "Due to his arrested hydrocephalus due to his infantile meningitis which has affected his cognitive abilities and now with pituitary and hypothalamic dysfunction due to his inoperable hypothalamic glioma brain tumor I would fully support that he is likely permanently disabled and will require ongoing medical care." (Id.)

Love also submitted records from Dr. Veena Nadkarni, an endocrinologist. (Id. at 339-348.) These records show Dr. Nadkarni's July 27, 2011 diagnosis of panhypopituitarism, pituitary gland adenora, and adrenal inefficiency. (Id. at 339.) Dr. Nadkarni reiterated those findings and ordered additional tests on October 26, 2011. (Id. at 346.) Dr. Nadkarni prescribed two intramuscular injections of testosterone and prescriptions of oral bromocriptine, levothyroxine, hydrocortisone, and Vitamin D. (Id. at 347-48.) It is unclear whether the Appeals Council was aware of Dr. Nadkarni's treatment records because it did not reference them in its denial of review of the ALJ's decision. (Id. at 5.)

## B. Love's Hearing Testimony

Love was 38 years old at the time of the administrative hearing. (A.R. 30.) He testified that he completed five years of special education classes in high school and graduated. (Id. at 31.) At the time of the hearing, he was living with his brother and sister-in-law and their two children, who were then four and six years old. (Id. at 34, 36.) He had never lived alone. (Id. at 34.)

Love described his activities of daily living. He testified that he starts his day by helping his niece and nephew get to the school bus. (Id at 34.) He prepares his breakfast and watches television. (Id.) He takes care of his personal needs, such as bathing and dressing himself. (Id. at 42.) He does his own laundry and he helps wash the dishes. (Id. at 39.) He leaves home with his brother and sister-in-law sometimes, and sometimes he visits his parents. (Id. at 35.) He goes to Bible study once a week and to church once a week. (Id. at 41.) The only places he visits

on his own are his doctors' offices.  (Id. at 35.)  As for social activities, he testified that his license to drive expired some time ago, that he used to enjoy playing basketball and working out but that he can no longer engage in those activities, and that he does not have any friends.  (Id. at 35, 40-42.)  As for work activities, Love explained that he worked as a dishwasher until 2000, but that he could no longer perform this job because he cannot tolerate the bending or lifting it requires.  (Id. at 31-32.)  During his 10 years of imprisonment, he did not perform any jobs or seek medical care from any doctors.  (Id. at 40-41.)

Love also provided testimony about his medical conditions.  He suffered two seizures in his life.  (Id. at 38.)  The first seizure was in 1980 and the second in August 2010.[2]  (Id.)  He takes Dilantin three times a day to prevent seizures.  (Id. at 32.)  Other medical issues include a hernia in his stomach.  (Id. at 34.)  The hernia does not cause pain, but his stomach becomes bloated when he drinks a lot.  (Id.)  No doctor has advised him to avoid lifting weight because of the hernia.  (Id. at 35.)  Love also takes medication to address his frequent need to urinate.  (Id. at 33.)  Without the medication, he testified that he needs to go to the bathroom 20 or 30 times a day and sometimes cannot hold his urine.  (Id.)  But when he takes the medication, he needs to go to the bathroom only about 15 times a day.  (Id.)  His need to urinate wakes him from his sleep.  (Id.)

---

[2]  The court presumes that Plaintiff made an error with respect to the month of his second seizure.  He told Dr. Jones that he suffered a seizure on July 9, 2010.  (A.R. 283.)

He is under the care of Dr. Hurley for a brain tumor.  (Id. at 32.)  Love testified that because of the tumor, he can hardly walk, and his feet hurt, and he "can't do anything."  (Id. at 32-33.)  Dr. Hurley monitors the tumor every six months.  (Id. at 38-39.)  Love also sees a foot doctor to address the pain in his feet. (Id. at 34.)

## C.   Vocational Expert's Testimony

Vocational Expert ("VE") Steve Alsprower answered the ALJ's questions about the kinds of jobs a person with certain hypothetical limitations can perform. (A.R. 43-48.)  The VE testified that he had reviewed Love's file and had been present for Love's testimony.  (Id. at 43.)  The VE identified Love's past work as that of a kitchen helper, which is an unskilled job of medium exertion.  (Id.)  The ALJ asked the VE to consider an individual of Love's age, education, and work experience.  (Id. at 43-44.)  The ALJ described the individual as having the capacity to perform light work, so long as it did not have a fast pace and consisted of an unskilled, simple, routine, and repetitive task.  (Id.)  The VE replied that this individual could work as a packager, a racker, or as a cleaner/housekeeper.  (Id. at 44.)  Love's attorney then asked the VE to add one more limitation to the hypothetical question: the need to take an unscheduled break once an hour for the purpose of using the restroom.  (Id. at 46.)  The VE commented that the DOT and supporting documents "don't actually address what I'm considering."  (Id.)  The VE testified that workers are typically on task for all but 10 minutes an hour, but those 10 minutes are "spread out." (Id.)  He opined that if the hypothetical individual left

his workstation for 10 minutes out of an hour, that this absence would be considered excessive. (Id. at 47.) But when Love's representative asked about leaving his workstation once an hour to use the restroom, the VE testified that "I don't think that that's an issue." (Id.) The VE testified that the restroom's location within the work facility would be a factor in determining whether the bathroom breaks would be "an issue." (Id. at 46-47.)

## D. The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Love is not disabled under section 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. § 1382(c)(3)(A). (A.R. 11-21.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 416.920(a)(4). At step one the ALJ considered the claimant's work activity. 20 C.F.R. § 416.920(a)(4)(i). The ALJ found that Love had not worked since his application date of October 14, 2009, so she proceeded to the next step, which is the consideration of the medical severity of the claimant's impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii).

A "severe" impairment or combination of impairments is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The ALJ concluded that Love's impairments of borderline intellectual functioning, remote history of seizure disorder, hypothalamic mass, and low blood pressure were severe within the meaning of the Commissioner's regulations, but that Love's borderline diabetes mellitus, degenerative joint disease, polyuria, and anemia were nonsevere. (A.R. 13.) At step

three the ALJ considered whether Love's impairments or combination of impairments met or equaled one of the listed impairments in the Commissioner's regulations. *See* 20 C.F.R. § 416.920(a)(4)(iii). The ALJ gave particular consideration to Listing 12.05, Mental Retardation, and concluded that the medical record did not establish that any of Love's impairments, individually or in combination, met or equaled the severity of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. 13-15.)

At step four the ALJ considered Love's residual functional capacity ("RFC") and past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv). The ALJ concluded that Love retains the ability to perform light work as defined in 20 C.F.R. § 416.967(b) except that his work cannot be fast-paced and should involve only unskilled, simple, repetitive, and routine tasks. (A.R. 15-19.) The ALJ concluded that the requirements of Love's past relevant work exceed this RFC. (Id. at 19.) At step five, the ALJ concluded that considering Love's age at the time of his application, his education, work experience, and RFC, Love would be able to work as a packager, racker, and cleaner/housekeeper. (Id. at 20.) Accordingly, the ALJ concluded that Love has not been under a disability, as defined by the Act, since the date of his application. (Id.)

## Analysis

Love argues that the ALJ made reversible errors at steps two and three of the required analysis and by posing incomplete hypothetical questions to the VE. He also challenges the Appeals Council's denial of review on the basis of additional

medical evidence. The Commissioner filed a cross-motion for summary judgment, arguing that the ALJ's step two and step three analyses were supported by substantial evidence, and that the ALJ's hypothetical questions incorporated Love's impairments to the extent that the ALJ found them supported by the evidence in the record. The Commissioner also argues that the additional evidence that Love submitted did not meet the Appeals Council's criteria for review nor does it merit a remand by this court.

This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A. "Playing Doctor" at Steps Two and Three

Love's first argument is that the ALJ's step-two and step-three analyses are erroneous because they rely, in part, on what Love characterizes as the ALJ's lay

opinion of medical matters. Love argues that the ALJ should have requested the opinion of an additional medical expert to review the treatment records detailing his hypothalamic glioma, hypothalamic dysfunction, and urinary urgency because these records were not available when Love was evaluated by the consultative examiners. Love argues that because there was no secondary medical opinion of those treatment records, there was an evidentiary gap in the record that the ALJ could fill only by relying on her own lay opinion. Love contends that the ALJ was forced to "play doctor," leading to reversible errors in the step two and three analyses.

Love's argument invokes *Blakes ex rel. Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir. 2003). In that case, the Seventh Circuit explained that an ALJ may not rely on a hunch or reach a conclusion about how to remedy a claimant's mental retardation absent medical evidence supportive of that conclusion. *Id.* Similarly, in *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996), the Seventh Circuit vacated an ALJ's adverse decision because the ALJ ignored reports of consulting doctors and substituted his layman's view of depression for that of the treating doctor when he concluded that the claimant's efforts to work were incompatible with the doctor's diagnosis of depression. The court faulted the ALJ for impermissibly "playing doctor." *Id.* But here, Love has not pointed to any treatment records that the ALJ ignored or to any independent medical conclusions rendered by the ALJ that would show that she "indulged [her] own lay view" and ignored the expert view of Love's physicians. *See id.* at 971.

Instead, Love argues that the ALJ should have found that his polyuria is a severe impairment at step two because Love has "a hernia wrapped around his testicles." (R. 11, Pl.'s Mem. at 12.) Perhaps Love believes that an independent medical expert would have rendered this opinion on the basis of the treatment records. But Love submitted no evidence of a testicular hernia—he did not testify to having a testicular hernia, none of the treating or consulting physicians mention any issue relating to Love's testicles, and the administrative record is otherwise devoid of any evidence of a testicular hernia. Although the record indicates that Love has an incisional abdominal hernia with no loops of bowel in it, the diagnostic report does not mention Love's testicles. (A.R. 316.) At the hearing, Love testified that the hernia does not cause pain and that he had not been put on any lifting restrictions as a result of it. (Id. at 35.)

The ALJ's opinion references Love's testimony about the abdominal hernia. (Id. at 16.) It also notes Love's comment to a nurse in September 2010 that he had no medical complaints other than a recent seizure and bone aches, which suggests that the hernia was asymptomatic. (Id. at 17 (citing id. at 278).) The ALJ rendered no opinion, medical or otherwise, about Love's hernia, other than the implicit conclusion that the hernia was not an impediment to Love's capacity to perform light work with non-exertional restrictions. This conclusion is supported by the medical record, which shows no treatment, restrictions, or allegations of pain because of the hernia. Love is unable to show that the ALJ ignored relevant medical evidence, substituted her view for that of a physician, or made a

determination best left to a medical expert.  Accordingly, his argument that the ALJ "played doctor" in regard to the alleged testicular hernia must fail.  *Compare Myles v. Astrue,* 582 F.3d 672, 677-78 (7th Cir. 2009) (reversing because ALJ relied on his lay intuition—instead of medical evidence—about the treatment protocol in assessing the severity of the claimant's illness).

Love also challenges the ALJ's step-two finding that his polyuria is a non-severe impairment.  The Commissioner's regulations explain that a "severe" impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  The ALJ referenced the following medical evidence to show that Love's polyuria does not meet that standard: (1) the September 2010 treatment note that acknowledged Love's longstanding history of urinary urgency as well as Love's comment that he suffered accidents if he could not get to the washroom in time; (2) an October 2010 treatment record that "[p]olyuria resolved;" and (3) a November 2010 treatment record noting that Love started on desmopressin to reduce urine output.  (Id. at 17 (citing id. at 262, 325-26).)  The ALJ recognized the lack of new diagnoses or treatment changes relating to polyuria after November 2010.  (Id. at 17.)  The ALJ also summarized Love's testimony that he needs to use the restroom at night and about 15 times a day despite the medication.  (Id. at 16.)  The ALJ discredited Love's testimony, (id. at 17), and Love does not challenge this adverse credibility assessment.  The ALJ thus provided sufficient evidence "for a reasonable person to accept as adequate to

support the decision" regarding the severity of the limitations caused by Love's polyuria. *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003).

Love also makes an undeveloped argument that the ALJ "played doctor" because she did not address record evidence of hydrocephalus and hypothalamic dysfunction. At the time of the ALJ's decision, the only evidence relating to hypothalamic dysfunction was Dr. Hurley's order of blood tests to assess Love's hypothalamic-pituitary axis. (A.R. 263.) Love's diagnosis of panhypopituitarism, pituitary gland adenora, and adrenal inefficiency was not made until July 27, 2011, fully two months after the ALJ issued her decision. (See id. at 21, 339.) This court cannot criticize the ALJ for failing to acknowledge evidence that was not made available until after the ALJ issued her opinion. *See Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012) ("It was 'not appropriate . . . to consider evidence which was not before the ALJ, but which [plaintiff] later submitted to the Appeals Council' because 'the Appeals Council eventually refused [plaintiff's] request to review the ALJ's unfavorable decision.'" (quoting *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004))).[3]

Love's argument about the ALJ's consideration of hydrocephalus is no stronger. Love claims that the ALJ "never addresses" the diagnosis of hydrocephalus. (R. 11, Pl.'s Mem. at 12.) Perhaps the ALJ's citation to Dr. Hurley's treatment note about hydrocephalus was unnoticed by Love. (A.R. 17.) Dr. Hurley opined that Love did not have obstructive hydrocephalus, while the presence of

---

[3] The Appeals Council's decision denying review of the ALJ's decision despite the submission of additional evidence is discussed *infra* in Section C.

prominent ventricles suggested potential arrested hydrocephalus. (Id. at 262-63.) In that same treatment note, Dr. Hurley wrote that Love did not complain of any symptoms to suggest signs of intracranial pressure. (Id. at 262.) The ALJ echoed that comment during her discussion of Love's hypothalamic lesion when she wrote that "the claimant exhibited no symptoms to suggest active or acute increase in intracranial pressure." (Id. at 17.) Love has not indicated how the ALJ manifested a lay opinion or supplanted Dr. Hurley's views with her own, so this court must reject his claim that she "played doctor" in her assessment of the impact of his hydrocephalus. *See Myles*, 582 F.3d at 677-78.

Love reiterates his argument that ALJ "played doctor" at step three. According to Love, the ALJ interjected her lay opinion into the assessment of whether Love's impairments met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App. 1. In Love's view, the ALJ should not have undertaken this analysis without a medical consultative examiner's review of the medical records dating from May 2010 through 2011. Love suggests that had the ALJ sought a medical opinion of those records, she would have concluded that Love's impairments met or medically equaled listing 12.02, entitled Organic Mental Disorders. Love does not challenge the ALJ's conclusion that his impairments did not meet or medically equal listing 12.05, entitled Mental Retardation.

The ALJ wrote that she considered all of the listed impairments with particular focus on listing 12.05. (A.R. 13.) In concluding that Love's borderline intellectual functioning was insufficiently severe to meet listing 12.05, the ALJ gave

great weight to the opinion of Dr. Heinrich, who had assessed Love under listing 12.02 and concluded that Love did not meet the requirements of that listing. (Id. at 216-29.) The ALJ adopted Dr. Heinrich's 12.02(B) assessment of Love's restrictions in activities of daily living, social functioning, concentration, persistence, and pace, and episodes of decompensation, because the 12.02(B) assessment is the same as the 12.05(D) assessment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(B), 12.05(D). The ALJ concluded, as did Dr. Heinrich, that Love's mental impairment caused the following: a mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Id. at 14-15, 18-19, 226.) The ALJ found that these restrictions were insufficiently severe to meet the requirements of listing 12.05(D). (Id. at 13-15.) Love does not challenge the ALJ's analysis in this regard.

But Love makes an undeveloped argument that had the ALJ consulted a medical advisor, she would have found that he met the requirements of listing 12.02. That listing defines organic mental disorders as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02. Under listing 12.02, a claimant is considered disabled if he demonstrates the required level of severity to meet both the 12.02(A) and (B) criteria, or the 12.02(C) criteria. Id. Love does not assert any error in the ALJ's endorsement of

Dr. Heinrich's findings that he did not exhibit the marked restrictions in activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, and pace or the repeated episodes of decompensation required to meet 12.02(B). Thus, because Love has not challenged the finding that he does not meet the 12.02(B) criteria, he would have to show that he meets the 12.02(C) criteria. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment.").

Love's bare supposition that an additional medical consultant would have opined that he meets the 12.02(C) criteria is not enough to meet this burden. Love seems to suggest that the continued existence of his hypothalamic glioma would necessitate a positive finding under listing 12.02. But the 12.02(C) criteria require more than the existence of a hypothalamic glioma. Rather, to meet 12.02(C), Love has to show a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of the three following conditions: (1) repeated episodes of decompensation; (2) "a residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change . . . would . . . cause the individual to decompensate"; or (3) a continued need for a highly supportive living arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(C).

Love does not cite to any of the medical evidence that emerged after Dr. Heinrich's assessment and before the ALJ's ruling to show that he would meet the 12.02(C) criteria. Nor does he question the ALJ's adverse credibility finding that the medical record does not support his testimony regarding the degree of his alleged limitations due to the hypothalamic mass. (A.R. 18.) Rather, he references an April 2011 opinion from Dr. Hurley that Love submitted to the Appeals Council after the ALJ had ruled. Again, this court cannot rely on evidence that was not submitted to the ALJ when assessing whether the ALJ's decision is supported by substantial evidence. *See Farrell*, 692 F.3d at 770.

## B. Hypothetical Questions

Love argues that the hypothetical questions the ALJ posed to the VE did not adequately describe his work related limitations because they failed to incorporate his urinary urgency. The Commissioner counters that the ALJ's hypothetical question described the impact of Love's impairments to the extent that the ALJ found them supported by the record. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987)). This court agrees with the Commissioner that the ALJ's hypothetical question met that standard. The ALJ's conclusion that Love's polyuria was not a severe impairment was supported by the medical evidence and the unchallenged adverse credibility ruling. The most recent medical records available to the ALJ showed that Love's "polyuria resolved." (A.R.

326.)  The hypothetical was also supported by the ALJ's observation that Love retained his employment as a dishwasher for approximately nine years and was terminated for reasons unrelated to medical issues.  (Id. at 18.)  This court finds no error in ALJ's conclusion that Love's urinary urgency was not sufficiently limiting as to require its inclusion in the hypothetical question.  *See Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) ("Ordinarily, a hypothetical question to the [VE] must include all limitations supported by medical evidence in the record.").

Even if the ALJ ought to have included a limitation regarding Love's frequent need to urinate in the hypothetical, her reliance on the VE's testimony does not constitute reversible error because the VE was aware of the issue.  *See Young*, 362 F.3d at 1003 ("The hypothetical need not include every physical limitation, provided that the [VE] had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing.").  The VE testified that he had reviewed Love's file and had been present for Love's testimony.  (A.R. 43.)  Then, when Love's representative asked him to consider that the hypothetical individual needed to take an unscheduled break once an hour to use the washroom, the VE responded "I don't think that that's an issue, dependent upon how long he was gone."  (Id. at 46-47.)  The VE conceded that the location of the restroom within the facility would be an issue because an absence of 10 minutes from a workstation "would be considered excessive."  (Id. at 47.)  The VE interjected the 10-minute increment into the

discussion by analogy, as he "typically testif[ies] to the fact that people are . . . typically focused on the tasks . . . all but 10 minutes out of the hour." (Id. at 46.)

Love tries to create a reversible issue from the VE's testimony by asserting that his polyuria would, in fact, require him to spend 10 minutes an hour visiting the bathroom. In his view, it defies common sense that a racker, bagger, or cleaner/housekeeper could maintain his or her employment despite unpredictable absences of 10 minutes every hour. But because there is no medical evidence to establish that Love actually needs 10 minutes to use the restroom, or any medical evidence to contradict his treating physician's comment that his "polyuria resolved," this point seems irrelevant. (See id. at 326.) Love's testimony about his urinary needs—which the ALJ doubted, a finding not challenged by Love—was that he needs to urinate about 15 times a day. (Id. at 33.)

This court will not remand a case if it is convinced that the ALJ will reach the same result. *Pepper*, 712 F.3d at 367. Here, any deficiency in the ALJ's hypothetical question was corrected by Love's representative's questions about unscheduled restroom breaks. Love's new arguments in his reply brief about his alleged functional illiteracy and moderate limitations in concentration need not be addressed because they are waived. *See Nationwide Ins. Co. v. Central Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013) ("[I]t is well established that arguments raised for the first time in a reply brief are waived." (internal quotation omitted)).

23

## C.    Appeals Council's Consideration of Additional Evidence

Love argues that the additional evidence that he submitted after the ALJ ruled shows that the ALJ's decision was contrary to the weight of all the evidence and that the Appeals Council erred by failing to consider it. The Commissioner's regulations state that the Appeals Council shall consider "new and material evidence . . . only where it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b). If the additional evidence meets those requirements, then the Appeals Council "will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

In this case, the Appeals Council wrote that it "found no reason under our rules to review the [ALJ's] decision." (A.R. 1.) The Appeals Council indicated that it had considered the brief filed by Love's representative as well as the additional medical evidence of record dated April 21, 2011. (Id. at 5.) This might suggest that the Appeals Council concluded that the April 2011 documents were not new, not material, or not related to the relevant time period within the meaning of 20 C.F.R. § 404.970(b), or it might suggest that the Appeals Council concluded that the evidence met those three prerequisites, considered the additional evidence, and then concluded that it did not render the ALJ's decision contrary to the weight of the evidence. The Appeals Council did not mention the additional evidence dating from July and October 2011, which suggests that it found the evidence to be non-qualifying under section 404.970(b), though ambiguity remains.

This court turns first to the April 21, 2011 treatment record that the Appeals Council acknowledged in its list of exhibits. (A.R. 5.) In this treatment note, Dr. Hurley wrote that Love had returned to the office "for routine follow up with new MRI." (Id. at 338.) Dr. Hurley referred Love to the endocrinology department for "pituitary-hypothalamic dysfunction due to hypothalamic glioma." (Id.) He opined that his treatment plan was to just observe the hypothalamic mass as long as there is no change. But, Dr. Hurley offered the following opinion: "Due to his arrested hydrocephalus due to his infantile meningitis which has affected his cognitive abilities and now with pituitary and hypothalamic dysfunction due to his inoperable hypothalamic glioma brain tumor I would fully support that he is likely permanently disabled and will require ongoing medical care." (Id.)

This court agrees with the Commissioner that Dr. Hurley's opinion that Love is "likely permanently disabled" does not mean that Love is entitled to benefits, as this opinion is on an issue reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). What remains of this treatment note, then, is Dr. Hurley's commentary showing no changes in treatment or functional limitation, a renewed recommendation for continued observation of the glioma, and a referral to endocrinology. (A.R. 338.) Other than reciting the relevant law, Love makes a minimal effort to persuade this court that Dr. Hurley's treatment note is "new" and "material" within the meaning of 20 C.F.R. § 404.970(b). Regarding materiality, Love does not explain how the treatment note

"fills in an evidentiary gap" or confirms a diagnosis alleged by the claimant but discredited by the ALJ. *See Farrell*, 692 F.3d at 771 (finding additional evidence to be material under 20 C.F.R. § 404.970(b) because it confirmed a diagnosis alleged by the claimant but discredited by the ALJ due to an "evidentiary gap"). Because the April 2011 treatment note shows no change in symptoms, diagnosis, or treatment, this court concludes that it is not material within the meaning of 20 C.F.R. § 404.970(b) and that the Appeals Council's conclusion that the treatment note did not provide a basis to remand to the ALJ was not erroneous.

The additional evidence from July through October 2011 consists of treatment records prepared by Dr. Nadkarni, an endocrinologist. (A.R. 339-50.) Love advances no theories to bolster his claims that this evidence is new, material, and relating to the time period considered by the ALJ. *See* 20 C.F.R. § 404.970(b). In fact, Love does not describe these documents in his argument in any capacity. This "[c]ourt need not devote its time to discussion of [an] argument raised, if at all, 'in a very opaque manner.'" *See Ehrhart v. Sec'y of Health and Human Servs.,* 969 F.2d 534, 537 n.5 (7th Cir. 1992) (quoting *Hanrahan v. Thieret,* 933 F.2d 1328, 1335 n.13 (7th Cir. 1991)). Similarly, Love presented no theories to support his claim that the additional evidence entitles him to a "sentence six" remand under 42 U.S.C. § 405(g), so to the extent that Love intended to make that argument, it is considered waived. *Id.*

## Conclusion

For the foregoing reasons, Love's motion for summary judgment is denied and the Commissioner's cross-motion is granted. The decision of the Commissioner is affirmed.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**